Nancy Berryhill, Acting Cmsnr Mr. Kelly. May it please the court. The issue today is what right does a claimant have in a disability claim to cross-examine a non-examining state agency physician upon whom the ALJ relies to deny their claim. Appellate's position on this case is that the prior case of Lighty v. Sullivan already encompasses the extension of, or not the extension, but already encompasses the right to have the cross-examination of a non-examining expert and that there is no basis under the law to fashion a rule based upon examining relationship alone. But that case, of course, was only for an examining physician. Well, but I think the court Is that right or wrong as to the facts? I don't think it's just limited to the facts. I think it's limited to I think What were the facts of that case? That was an examining physician, right? Yes, that case did involve an examining physician, but the administration originally argued that the rule should only apply to non-examining physicians was their first position and that, as you pointed out in the decision, Judge Smith, was that that was an examining physician, but also that there was a further distinction that they tried to allege that there was a distinction between a treating physician who examined the claimant versus a state, versus a consultative examiner ordered by the administration, which you also said was not a distinguishing factor or anything mentioned in Richardson v. Perales. The court actually, in Richardson v. Perales, when it talked about the cross-examination, everybody refers to the actual point at which I discussed that it was a hearing examiner, but the court goes on to state that the fairness, you know, in the integrity of the admission of the consultative report, which would otherwise be hearsay, they are still subject to being material and the use of subpoena and the consequent cross-examination, and I think that's where we got to the point of trying to cross-examine the state agency physicians. Assuming you're right, that you had a right to the subpoena, how would it have changed the outcome? I mean, I think it was about eight years had passed, maybe I think more than five years had passed since that form had been filled out. What would you have gleaned from any cross-examination that would have changed the outcome? In terms of the overall impact, in terms of the cross-examination, is that the administration, as part of their process, has put in that these individuals are highly qualified in the disability review process, and so in terms of attempting to glean additional information out of that, it would go to the impact of the extent of the individual's time reviewing the file, who prepared this. It goes all the way to, it goes down to the credibility and reliability of the particular opinion in this case. I think it's doubtful they'd remember filling out a form years before. I mean, maybe, were you just going to ask about their particular, their general procedures? Not in general procedures, but more so in terms of the, you know, who prepared it, their understanding of agency positions and agency process. One of the things that has occurred more recently is the DDS administration doesn't necessarily handle all the files in Texas. They refer them to other jurisdictions, for example, Arkansas and the Eighth Circuit. Those doctors may not have an understanding of the applicability of Stone versus Heckler where, you know, in terms of the minimal applications, they could omit impairments that would otherwise be considered minimally severe under the Fifth Circuit standard. So the doctors would need, the doctors in Texas DDS or Louisiana or Mississippi would be trained in terms of the severity standard versus the significantly impaired standard that is used, say, in the Eighth Circuit. So it goes down to the policies and the procedures that the individual is particularly trained for to determine whether or not the opinion is supported at that point. But more importantly in this case, Dr. Rosenstock's opinion was the key opinion relied upon by the administrative law judge. Even if we're not suggesting, I guess the point is that by denying the cross-examination or even the submission minimally of the interrogatories is that we were denied the opportunity to make any type of offer of proof. We're looking to make a record that in terms of the decision that is being reviewed at a later stage if the case is denied is that claimants be offered the opportunity to admit or seek out evidence that would normally have been conducted through discovery process, you know, in a regular trial. But did you have any inkling that there was actual evidence out there or that there was information that would help your position or that the reporting physician didn't know what he was doing? The only information that we've really been able to gather has been what has been able to gather through other, you know, in terms of transparency websites and different things through the state of Texas. But again, the information is not... What does that mean? Well, for example, in terms of how much money Dr. Rosenstock receives from the DDS on a yearly basis, but in terms of that, that really goes more to weight. But for example, Dr. Rosenstock has been through other information. We have discovered that they are basically paid $17 a file to review these cases. So if you divide $17 by $200,000 a year, it works out that the doctors have maybe eight minutes to review every single file and that they are relying extensively on disability examiners who we have no idea what their training is in these cases. How do you know that some of that payment wasn't allocated to the doctor when he had to give a deposition or we had to appear in court? You're just presuming it was all reviewing time, right? There's nothing to suggest that they are making any appearances for any other type of deposition activity or whether or not they have their own practices. And that's part of what we're saying is that we're looking to establish that information because at this point, you know, the judges are the gatekeepers on these cases and we're limited by what we can have access to. The POMS in particular, POMS DI 29501.025, was changed to state that all interrogatories or any requests to state agency physicians have to go through the ALJ. So there's no way for us to independently try to seek this information from those DDS doctors directly. And that's one of the reasons that, that was one of the things that we had pointed out was that no one had, that the magistrate judge did not address the interrogatories that were submitted along with the request as an alternative means in terms of trying to at least get basic or starting information from the, from the state agency physicians to begin with before we ever started getting into the inquiry of whether or not they needed to actually appear and testify at the hearing itself. No other circuit follows the Liddy decision on an absolute right to a subpoena. So why shouldn't we limit it to its facts, which are, is for examining physicians? Well all the other cases that are out there that distinguish themselves from Liddy generally are to a certain extent are factually distinguishable anyway to the extent that the rules that the Fifth Circuit uses, the result that occurred in some of those files would not have occurred. So for example, particularly like with the Flatford v. Chater case out of the Sixth Circuit, that involved a post-hearing case, post-hearing information, because of the Hall v. Schweiker, Morgan, and Newton rule, they have to follow the Halleck's procedures in those cases and so the responses in those particular situations would be proffered by the judge and under the proffer rules of Halleck's, you end up, they must offer the opportunity for a supplemental hearing in the appearance of the attorney. So that they can be reconciled factually because most of the time with our strict application of the internal rules of Social Security would have avoided the consequence of almost all the other cases that, you know, that distinguish. There's decisions like Butera in the Seventh Circuit. I mean there's a number of them. Let's at least put it this way, you agree no one's followed our view of an absolute subpoena. That's correct. None, they have not. So why shouldn't we limit it to its facts to avoid, I mean Social Security's an area of the law where there are tens of thousands of these things pending right now, maybe more than that, across the country. Isn't uniformity particularly important? Well uniformity is important, but the factual situations of a case have been changed by their own regulatory changes and how they are conducting their hearings at this point anyway. 404-936 has been amended one time already to provide that medical experts and vocational experts can appear by telephone. That was one of the things that was pointed out in the Passmore case was that they were concerned about bringing a doctor in from South Carolina to Tennessee to testify. Now because of VTC hearings and because of telephone opportunities, we have vocational experts and medical experts appearing in cases in Texas from California all the way to Florida on a regular basis. The DDS officials are sitting, the DDS doctors are sitting down in Austin. It's simply a matter of hooking up a telephone for them to appear and testify. In fact, this 936 has been sent back again for another revision that appearance by telephone, unless otherwise mandated, is going to be the preferred method for the experts to appear at the hearings at this point. So who pays that expert fee for the testimony? Social Security I would assume would pay the case. Texas has opted to take a piecemeal approach that they are paid on a per file basis. Other states have the doctors on staff and are paid a particular salary, so presumably they would be available to testify in each situation depending upon, you know, I mean it would either be an additional fee or it would just simply be part of their salary depending on how Social Security and the state DDS is elected to pay their doctors at that point. Returning back though to the point of the type of information that could be obtained in these particular cases, that's the reason that we have submitted the additional case of Goodnight v. Chater, where the doctors actually testified when they were able to cross-examine the individual that they in fact did sign off on RFC opinions and different aspects without ever reviewing the file at all and that they were totally dependent upon DE's disability examiners, pardon me, for those individuals and they did not know the qualifications of the individual who put in the information. And so this is going to be more so important going forward in these cases. Yes, this is a rule for the law as it existed here, but in terms of going forward in the law, there is not a situation or they have changed the rules with regards to treating sources and that there is no longer a deference to or a preference for treating source opinions and that the doctors and that the ALJs are going to be relying upon testimony or opinion evidence from individuals that we will have no access to going forward. As we pointed out, that other agencies are now starting to be called into question over their positions where they are basically tilting the table in their favor to manufacture a win by precluding the ability to have access to these doctors. And that's where we are in this case as that we attempted to comply, I mean, even if you take the fact of terms of the, that it is a qualified right, we still put in sufficient information and put into the record, you know, the request itself, identifying the stuff as required by 404-950 and were denied the opportunity of even having the interrogatory sent out as an initial matter. All right, thank you, Mr. Capelli. You saved time for rebuttal. Mr. Hernandez? May it please the Court, my name is Jay Ricardo Hernandez. I am here on behalf of Acting Commissioner Berryhill. Your Honors, the singular issue of this case is whether the 1991 decision in Leidy, which grants an absolute right to cross-examine the report of an examining physician, should be extended. And, of course, our position is that it should not be. And our position is that it is not justified by the Perales decision, which Leidy was based upon. Perales was explicitly about the report of an examining physician and did not address non-examining physicians. And in a broader sense, Perales was about applying more conventional or courtroom rules of evidentiary procedure to the administrative context. And back in 1971, when Perales was decided, I suppose it was still a fresh issue before the Court, but now it is well settled that no, the federal rules of procedure do not apply in the administrative context and that we will generally need to have a less formalized process when we deal with the huge amount of evidence that has to be dealt with in the Social Security adjudication system. Are we at liberty to ignore the hearing, the panel bound by Tanner? Yes, I would agree, Your Honor. And we are not advocating that either Leidy or Tanner be overturned. We can simply note that Leidy and Tanner, as they currently stand, are kind of out on an island, as noted in opposing counsel's argument. It hasn't been followed by other circuits. I know the goal in Leidy was to avoid a split in the circuits. That was the stated goal. That wasn't how it turned out. Opposing counsel is looking to depose or at least ask questions to the reporting physician. Isn't that what Tanner involved? Your Honor, it was a, I believe in Tanner it was a vocational expert. It was a report drafter after the fact. And while Tanner... Who was not the examining vocational expert? That is true. But as a, I would say that Tanner, as it applies to a vocational expert, a vocational expert is, as a matter of course, available for cross-examination in our disability hearing process. And we consider that to be a fundamental part of the process. Not relevant to this case. I would submit that it's not, Your Honor, because this deals with what is essentially a routine medical opinion document produced in the context of the earlier consideration of the case. So assuming Leidy's, I mean we have to, it's on the books. You can't get rid of it. What's the basis for distinguishing between subpoenas of an examining physician and someone here who just reviews the records and makes an opinion? Especially given, I think the Secretary's argument in that case was that if anything there was more of a right to subpoena for the case we're dealing with now. Well, Your Honor, when it comes down to it, and that was my last point in addressing Leidy's history, is that this represents a departure from the proper standard, which is to allow the ALJ the discretion to conduct the hearing as he or she sees fit. And when you grant this absolute right, of course you're taking away discretion from the ALJ. And that while Leidy did that in the context of an examining source, it was limited to that examining source. And a non-examining source simply doesn't have the same evidentiary weight. And also it's not going to have the same context. I believe, as noted in opposing counsel's argument, we're dealing with a doctor who is not necessarily going to remember it. I believe in one of the additional legal authorities that the plaintiff presented that talked about VA hearings and the value of subpoenaing a VA report drafter who is going to, as a necessity, refer back to his report to refresh his memory on something that happened two years ago, five years ago, I think in this case six years ago. And... Wouldn't there be a transcript of the hearing in addition to the report? Well, this would simply be a... It's not a report made pursuant to a hearing. At the DDS level, we have physicians on staff and under contract to the state agencies who review the medical evidence as it stands at the time and offer their medical opinion on the physical or mental capabilities of the individual in question. And that's not done in a hearing context or any sort of adversarial context. That's simply part of the process that happens before an ALJ hearing would even be requested. All right. As far as plaintiff's point that extending Leidy would be easy and without any real consequence to the agency, we respectfully disagree. Leidy has not had, I don't think, a huge impact in my experience. I've been with the agency many years. Subpoenas do happen. They're not necessarily disruptive. But part of that is because they're not commonly requested. Most of the time the examining source is the plaintiff's own physicians. And when we send somebody out to a consultative examination, it's not common even then to have that examining source subpoenaed for cross-examination during the hearing. However, we're dealing with an entirely different class of evidence here. We have state agency medical consultants who offer opinions in every last case. These individuals are a bottleneck. They're often retired physicians who are doing this on a contract basis after they're done with their practices. They're still licensed physicians. They're still experts for our purposes. But they are a bottleneck in the system. And for us to randomly remove them from their jobs, to have them testify, even if it is telephonically, it is going to have an impact on our ability to process cases. And arguably, an impact on our ability to get physicians who are willing to do this work. I would also note that in many cases we have multiple state agency medical consultants in the case. We'll have a physical opinion. We'll have a mental opinion, if there is. And then we'll have two more physicians offer opinions on reconsideration. So that's a possibility of four for a routine case. And in an odd case like Mr. Barrett's, where it has multiple levels and multiple applications, it's got a complex procedural history where we had multiple applications and consolidations and whatnot. We've had several over time. And as a matter of fact, they were requesting subpoenas for three physicians in this case, two of whom ended up being mooted due to the coverage of another decision that covered a period of time. What's your answer to the question of who would pay? I mean, normally in a civil lawsuit, the party issues the subpoena would have to pay for travel costs and everything else? Your Honor, my understanding is that the agency would be wholly responsible for that. We're responsible for providing our employees for examination in any court context. Would it be part of their normal salary or would there be an additional fee charged? In the event of travel, there might be additional compensation. But in the event of telephonic testimony, I think it would, they may have to travel. I don't know if there's a videoconferencing set up in every jurisdiction or every place where they're available. There might be minor travel. It might be within a certain commuting area. I would not anticipate that it would be a huge expense in that respect, Your Honor. All right. And yeah, my final point was simply that the testimony's going to have a question of value, simply because of the age of the decision and the inability of these professionals, given their workload, to distinguish between one particular claimant that they dealt with many years ago, many months ago, and the ability to provide a great deal of context beyond what's already in the report itself. As far as the circumstances in this particular case, Your Honors, we would submit that this is not a good case for a due process challenge. This is a case where plaintiff presented three identical form letters, and we respectfully disagree with opposing counsel that these letters stated information that did satisfy our requirements for the issuance of a subpoena under 405-950-D2. They needed to state, and in particular, what we need to have is a reason why this testimony is necessary for the decision in this case. And I think, as opposing counsel acknowledged, his concerns weren't about this particular case, necessarily. They were about the program in general and his suspicions as to what may or may not be happening in a regional or national context. And that was the specific reason the ALJ declined to order the subpoenas in this case, and he italicized it in his decision, is that it was not necessary for this particular case. And that was, I know plaintiff counsel has cited various reasons why he thought the ALJ may or may not have granted it, but this is what the ALJ said, absence of demonstration that additional information is necessary for a full presentation of italics, this particular case, the underside is not inclined to burden the State agency. And that was a specific reason, and that is entirely consistent with our agency's rules and policies, because it wasn't raising a question that would lead to provative evidence as to whether Mr. Barrett was or was not disabled. And another fundamental premise that I have to respectfully disagree with is that this particular opinion formed the basis of the ALJ's assessment. It did not. The ALJ did not adopt this assessment. He found a more restricted residual functional capacity than this particular State agency medical consultant assessed, which is what the ALJs do. They might use it as a starting place, but they're going to make their own assessment that's going to be based on the testimony that they hear, that's going to be based on the evidence that's received into evidence after these physicians offer their reports. In many cases, there are even more exhibits that are submitted after the State agency medical consultants offer their opinions than there were when the State agency medical consultant gave it in the first place. You can have, it's very common to see four or five exhibits in a file at the time that a State agency medical consultant offers the opinion, and maybe a dozen more later. It's entirely common for that to happen. And as a matter of fact, our rules specify that we should only give the State agency medical consultant's opinions credit to the extent they are consistent with the evidence that is received after their We've got a short list of what we would submit the case is not about. We submit the case is not about shielding State agency medical consultants from having to testify. We believe the existing rules are adequate to let our ALJs decide on a case-by-case basis whether it is reasonably necessary for this individual to testify. We are absolutely not taking the This is not about compliance with agency policy. It is our position that agency policy was properly followed in this case. This is not about a claim that the ALJ was of the position that the State agency medical consultants are not subpoenable. We would point you to the part in the decision where the ALJ specifically cited the appropriate standard under the regulations. He's not trying to shield anything or hide something. He's simply saying the case wasn't made in this particular case. Paralysis, this is not about paralysis because paralysis was explicitly restricted and only considered examining sources, not non-examining sources. This is not about the need for a specific ruling about State agency medical consultants. We are not of the position, and I know I'm repeating myself a little bit, but we're not of the position that the State agency medical consultants are immune to subpoena in any way. What would be an example when it would be appropriate to subpoena them? I would, I don't want to do his homework for him, but I would say, for example, in the context of a decision that is so divergent from the medical evidence of record, I could anticipate a subpoena request that says I would be interested in knowing how this consultant came to the conclusion, based on the physician opinions of record, that this individual, for example, needed a cane to walk, and yet this State agency medical consultant opined that this individual could do medium work, which involves standing all day and lifting and carrying objects weighing up to 50 pounds. If there's a huge diversion, if there's no connection between the evidence and the opinion being offered, I think that would either be a valid basis for cross-examining the State agency medical consultant, or what I think is probably the more common approach would be to say, look at this State agency medical consultant opinion. It has nothing to do with it, and, Your Honor, you shouldn't give it any credit. And that is the usual context in which this is going to be addressed. And finally, I would say this is not about the characterizations that Plaintiff's making in his briefs, about the ALJ having petty reasons for dismissing the subpoena request. This wasn't a fit of pique. This wasn't because the ALJ was insulted. If you take a look at the request, the request states, Your Honor, if you intend to rely on this doctor's opinion, you should have more information about the process at Disability Determination Service. They've gotten too much deference. I'm summarizing here, Your Honors. And they're saying that it's typically cursory, typically not consistent with the evidence. And perhaps maybe the ALJ did get a little prickly at the suggestion that he didn't know what his agency was up to. And as Judge Liken noted in the decision, he has personally visited the DDSs. The deficit in knowledge that was suggested in Mr. Burkhalter's letter simply wasn't there. Now, he didn't exactly go to investigate the source. It's simply part of what he did with the agency. He was with the Office of General Counsel. I'm personally acquainted with him. And he is a very knowledgeable individual. So I have no reason to think that that was the reason. As a matter of fact, he's a very technically oriented individual. And the fact that he italicized the specific reason, which correlates to the regulation in question, I think is suggestive of why he made that ruling. And my final point, Plaintiff puts in his last section of the argument, almost as an aside, that the ALJ's decision, it's his position that it's quote, unquote, unreviewable, even if you don't find in Plaintiff's favor on that. And I would suggest that, no, that's not consistent with the general principles of the Pellet Review, that even if I lose, I win. It doesn't work that way, Your Honors, and that any issues that he hasn't put before this Court are indeed waived. If the Court has no further questions, I have about three minutes left, but I believe I've made all my points. All right. Thank you, Mr. Hernandez. Mr. Kelly, you save some time for rebuttal. In requesting an absolute right to cross-examine, we are not infringing on the judge's discretion on how they manage their files. For example, in this case, the judge excluded two of the opinions because they were conducted after the point at which Mr. Barrett had been granted benefits. The other aspect of this is, is that he could have also agreed that in terms of the mental impairments, the VINA guy had opined that he was limited to essentially unskilled work. Because Mr. Barrett was over 50 at the time frame involved, then that would mean that if there's, if he's limited to unskilled work, there would be no issue of transferability. The judge could simply inquire, are you, are you engaging that the individual is disabled by the mental impairment or does the mental impairment eliminate an issue that I have to decide at the time? The fact that the judge made a more restrictive RFC is not what's important. It, the primary factor is, again, is because Mr. Barrett was over 50. If he was limited to sedentary unskilled work, the grid rules would direct a finding of disabled. So in terms of the finding, in terms of the opinion that he adopted, he adopted that he could be on his feet for six hours in an eight-hour workday, stand at, or, and then lift and carry 20 pounds occasionally and 10 pounds frequently. The evidence and the file, the information in the file was, at the time Dr. Thoreau, the original consultative examiner, performed his exam, there was little or no limitation. But by the time you get to January of 2000, you know, later timeframes where he ends up in the hospital with syncope, in January where he exhibits more weakness on the left side, and then by the time we finally get to June of 2010, he is limping and unable to move about. There was a progression of symptoms here. And so by starting with the foundational prospect, which is what the opposing counsel was, is the judge, rather than conducting a de novo review, was going to start from the position of the state agency doctor's opinion and see if anything had changed. But that's not, so what we're trying to get access to is trying to determine, in terms of the questions, is did they have sufficient information? And when it comes to the legal error, as this court pointed out in the more recent cases in terms of Ramirez and Neelan, if the decision or how the judge reached the RFC omits certain important information, like additional cross-examination of the state agency doctor, then the ultimate conclusion is not based upon the substantial evidence and it must be remanded. In terms of the type of information that we're getting to and whether or not it's important, the commissioner has recently amended the rules and regulations and under 404.17.40 now requires representatives to disclose in writing at the time of the hearing that whether or not the representative's employee or any individual contracting with the representative drafted, prepared, or issued the medical or vocational opinion. Sauce for the goose should be sauce for the gander. If we have to disclose this information, we should be able to inquire into that type of information from the state agency medical sources. And also, when it comes down to it, opinion evidence as pointed out by the, by Richardson v. Perales is judges are lay examiners. They are, they are using these medical advisors to help them with complex matters, but ultimately they start and end with medical opinions, either from a state agency, from a consultative examiner, or a treating physician. There are five people who we can contact in these particular cases. Examining physicians, we have an absolute right. Same with treating physicians. We have an absolute right. If a medical advisor shows up at the hearing, we have the right to cross-examine that medical advisor. If a medical advisor gives testimony through interrogatories after the hearing, under the HALEX rules of proffer and supplemental hearing, we have the right to talk to that doctor. Five doctors. There's one that's omitted from that, and that is the one doctor that the judges almost exclusively rely upon to deny the claims when it comes down to it. All right. Thank you, Mr. McKellie. Your case is under submission.